﻿Citation Nr: 19158990
Decision Date: 07/30/19 Archive Date: 07/30/19

DOCKET NO. 15-41 265
DATE: July 30, 2019

ORDER

New and material evidence not having been received, the appeal to reopen service connection for posttraumatic stress disorder (PTSD) is denied.

Service connection for a sleeping disorder, to include obstructive sleep apnea, including as secondary to the service-connected bipolar disorder, is denied.

Service connection for hepatitis C is denied.

Service connection for erectile dysfunction, including as secondary to the service-connected bipolar disorder and/or lumbar spine strain with degenerative disc disease (lumbar spine disability), is denied.

Service connection for gastroesophageal reflux disease (GERD), including as secondary to the service-connected bipolar disorder, is denied.

Service connection for a cervical spine disorder, including as secondary to the service-connected lumbar spine disability, is denied.

An extension of the temporary total disability rating for convalescence following revision ablation surgery on August 10, 2016, beyond November 1, 2016, is denied.

An extension of special monthly compensation based on housebound status, beyond November 1, 2016, is denied.

The Regional Office's (RO) finding that there was clear and unmistakable error in the December 2015 rating decision granting a separate disability rating for linear scars of the hands was proper.

The RO’s finding that there was clear and unmistakable error in the December 2015 rating decision granting a separate disability rating for scars on the hands and feet was proper.

An increased disability rating in excess of 60 percent for onychomycosis of the fingernails and toenails (onychomycosis) is denied.

A higher initial disability rating in excess of 10 percent for the lumbar spine disability is denied.

A higher initial disability rating in excess of 10 percent for right lower extremity radiculopathy is denied.

A higher initial disability rating in excess of 10 percent for left lower extremity radiculopathy is denied.

An increased disability rating in excess of 30 percent for bipolar disorder is denied.

A total disability rating for compensation purposes based on individual unemployability due to service-connected disabilities (TDIU) is denied.

FINDINGS OF FACT

1. The Veteran died in July 2018; the appellant is the Veteran’s surviving spouse, who is substituted as the claimant to continue the pending appeal to completion.

2. In an April 2015 rating decision, the RO denied service connection for PTSD on the basis that the evidence did not show a currently diagnosed disability; the appellant submitted a Notice of Disagreement in May 2015, but subsequently withdrew the appeal in an August 2015 written correspondence; evidence received since the April 2015 rating decision is new to the claims file but does not have any tendency to establish a current diagnosis for PTSD.

3. Prior to death, the Veteran was not diagnosed with a sleeping disorder, including obstructive sleep apnea.

4. Prior to death, the Veteran was diagnosed with hepatitis C; the Veteran received an air gun inoculation during service; the Veteran used intravenous drugs and intranasal cocaine for several years after service and engaged in high-risk sexual activity after service; the diagnosed hepatitis C had its onset after service and was not causally or etiologically related to service.

5. Prior to death, the Veteran was diagnosed with erectile dysfunction; the erectile dysfunction did not have its onset during service and was not etiologically related to service; the erectile dysfunction was not caused or worsened beyond its normal progression by the service-connected bipolar disorder; the erectile dysfunction was not caused or worsened beyond its normal progression by the service-connected lumbar spine disability.

6. Prior to death, the Veteran was diagnosed with GERD; the GERD did not have its onset during service and was not etiologically related to service; the GERD was not caused or worsened beyond its normal progression by the service-connected bipolar disorder.

7. Prior to death, the Veteran was diagnosed with degenerative disc disease, spondylosis, and degenerative arthritis of the cervical spine (cervical spine disorder); symptoms of the cervical spine disorder were not chronic in service, were not continuous since service separation, and did not manifest to a compensable degree within one year of service separation; the cervical spine disorder is not otherwise etiologically related to an injury, disease, or event during active service; the cervical spine disorder was not caused or worsened beyond its normal progression by the service-connected lumbar spine disability.

8. Revision ablation surgery performed on August 10, 2016 did not manifest severe postoperative residuals such as incompletely healed surgical wounds, stumps of recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, the necessity for house confinement, the necessity for continued use of a wheelchair or crutches with regular weight-bearing prohibited, or immobilization by cast, so as to require an extension of convalescence beyond November 1, 2016.

9. As of November 1, 2016, the Veteran had not been substantially confined to his house because of service-connected disabilities, nor did the Veteran have a single service-connected disability ratable at 100 percent along with other unrelated disabilities that combine to at least 60 percent.

10. The evidence has established, without debate, that the RO incorrectly applied the applicable laws and regulations existing at the time when it granted a separate disability rating for linear scars of the hands and feet. 

11. The evidence has established, without debate, that the RO incorrectly applied the applicable laws and regulations existing at the time when it granted a separate disability rating for scars of the hands and feet. 

12. For the entire rating period on appeal from May 1, 2017, the onychomycosis had more nearly approximated constant or near-continuous systemic therapy, such as corticosteroids or other immunosuppressive drugs required during a 12 month period.

13. For the entire initial rating period on appeal from June 6, 2016, the lumbar spine disability had been manifested by pain and limitation of forward flexion greater than 60 degrees, without ankylosis, limitation of forward flexion to 60 degrees or less, a combined range of motion in the thoracolumbar spine less than 120 degrees, muscle spasms, localized tenderness, or guarding severe enough to result in an abnormal gait or abnormal spinal contour, or incapacitating episodes requiring physician ordered bed rest having a total duration of at least two weeks during a 12-month period.

14. For the entire initial rating period on appeal from June 6, 2016, the right lower extremity radiculopathy had not manifested in moderate incomplete paralysis of the sciatic nerve.

15. For the entire initial rating period on appeal from June 6, 2016, the left lower extremity radiculopathy had not manifested in moderate incomplete paralysis of the sciatic nerve.

16. For the entire rating period on appeal from February 13, 2017, the bipolar disorder had manifested in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, and the severity of the bipolar disorder did not cause occupational and social impairment with reduced reliability and productivity.

17. For the period from September 22, 2014 to August 10, 2016, and from November 1, 2016 forward, the service-connected disabilities had not rendered the Veteran unable to obtain or maintain substantially gainful employment.

CONCLUSIONS OF LAW

1. The April 2015 rating decision denying service connection for PTSD became final. 38 U.S.C. § 7105(c); 38 C.F.R. §§ 3.104, 20.302, 20.1103.

2. New and material evidence has not been received to reopen service connection for PTSD. 38 U.S.C. §§ 5108, 7105(c); 38 C.F.R. § 3.156.

3. The criteria for service connection for a sleeping disorder, including obstructive sleep apnea, have not been met. 38 U.S.C. §§ 1131, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304.

4. The criteria for service connection for hepatitis C have not been met. 38 U.S.C. §§ 1131, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304.

5. The criteria for service connection for erectile dysfunction, including as secondary to the service-connected bipolar disorder and/or lumbar spine disability, have not been met. 38 U.S.C. §§ 1131, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.310.

6. The criteria for service connection for GERD, including as secondary to the service-connected bipolar disorder, have not been met. 38 U.S.C. §§ 1131, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.310.

7. The criteria for service connection for a cervical spine disorder, including as secondary to the service-connected lumbar spine disability, have not been met. 38 U.S.C. §§ 1131, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309, 3.310.

8. The criteria for an extension beyond November 1, 2016 of a temporary total rating based on need for convalescence following revision ablation surgery have not been met. 38 U.S.C. §§ 1155, 1156, 5103, 5103A, 5107, 7104; 38 C.F.R. §§ 3.102, 3.159, 4.30.

9. The criteria for an extension beyond November 1, 2016 of special monthly compensation benefits based on housebound status have not been met. 38 U.S.C. § 1114; 38 C.F.R. §§ 3.350, 3.351.

10. The December 26, 2015 RO rating decision granting a separate disability rating for linear scars of the hands and feet in addition to the 60 percent rating assigned for onychomycosis of the fingernails and toenails, was clearly and unmistakably erroneous, and it was proper for the RO in the July 25, 2016 rating decision to discontinue the separate disability rating for the linear scars of the hands and feet and combine the rating with the rating for onychomycosis of the fingernails and toenails. 38 U.S.C. § 5109A; 38 C.F.R. §§ 3.105, 3.400.

11. The December 26, 2015 RO rating decision granting a separate disability rating for scars of the hands and feet in addition to the 60 percent rating assigned for onychomycosis of the fingernails and toenails, was clearly and unmistakably erroneous; therefore, it was proper for the RO in the July 25, 2016 rating decision to discontinue the separate disability rating for scars of the hands and feet and combine the rating with the 60 percent rating for onychomycosis of the fingernails and toenails. 38 U.S.C. § 5109A; 38 C.F.R. §§ 3.105, 3.400.

12. For the entire rating period on appeal from May 1, 2017, the criteria for an increased disability rating in excess of 60 percent for onychomycosis have not been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.321, 3.326(a), 4.3, 4.7, 4.14, 4.21, 4.118, Diagnostic Code 7806.

13. For the entire initial rating period from June 6, 2016, the criteria for a higher initial disability rating in excess of 10 percent for the lumbar spine disability have not been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.321, 3.326(a), 4.3, 4.7, 4.14, 4.21, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5237.

14. For the entire initial rating period on appeal from June 6, 2016, the criteria for a higher initial disability rating for right lower extremity radiculopathy in excess of 10 percent have not been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.20, 4.124a, Diagnostic Code 8520.

15. For the entire initial rating period on appeal from June 6, 2016, the criteria for a higher initial disability rating for left lower extremity radiculopathy in excess of 10 percent have not been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.20, 4.124a, Diagnostic Code 8520.

16. For the entire rating period on appeal from February 13, 2017, the criteria for an increased disability rating in excess of 30 percent for bipolar disorder have not been met or more nearly approximated. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 4.3, 4.7, 4.130, Diagnostic Code 9432.

17. For the period from September 22, 2014 to August 10, 2016, and from November 1, 2016 forward, the criteria for a TDIU have been not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.340, 3.341, 4.3, 4.15, 4.16, 4.18, 4.19, 4.25, 4.26.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The appellant is the surviving spouse of the Veteran, who had active service from July 1982 to December 1982, and from December 1987 to February 1990. While the appeal was pending, the Veteran died in July 2018. The appellant is now pursuing the appeal as a substituted claimant under the provisions of 38 U.S.C. § 5121A. See July 2018 Notification Letter.

In a November 2015 VA Form 9, the appellant requested a Board videoconference hearing; however, the hearing request was subsequently withdrawn by the appellant in a May 2019 correspondence. As such, the hearing request is deemed withdrawn. 38 C.F.R. § 20.704(e).

1. Reopening Service Connection for PTSD

Finally decided claims cannot be reopened in the absence of new and material evidence. 38 U.S.C. § 5108; 38 C.F.R. § 3.156; Barnett v. Brown, 8 Vet. App. 1 (1995) (citing 38 U.S.C. §§ 5108, 7104(b)). Unappealed rating decisions by the RO are final with the exception that a claim may be reopened by submission of new and material evidence. 38 U.S.C. §§ 5108, 7105(c); 38 C.F.R. § 3.156. When a veteran seeks to reopen a claim based on new evidence, VA must first determine whether the additional evidence is “new” and “material.” See Smith v. West, 12 Vet. App. 312 (1999).

New evidence means existing evidence not previously submitted to agency decision makers. 38 C.F.R. § 3.156(a). Material evidence means evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. Id. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened, and must raise a reasonable possibility of substantiating the claim. Id.

The threshold for determining whether new and material evidence raises a reasonable possibility of substantiating a claim is “low.” See Shade v. Shinseki, 24 Vet. App. 110, 117 (2010). Moreover, in determining whether this low threshold is met, consideration need not be limited to consideration of whether the newly submitted evidence relates specifically to the reason why the claim was last denied, but instead should ask whether the evidence could reasonably substantiate the claim were the claim to be reopened, either by triggering VA’s duty to assist or through consideration of an alternative theory of entitlement. Id. at 118.

An April 2015 rating decision denied service connection for PTSD on the basis that the evidence did not show a current diagnosis for PTSD. The Veteran submitted a Notice of Disagreement in May 2015 but withdrew the appeal in an August 2015 written correspondence. Because no additional evidence was received within one year of the notice of the rating decision, the April 2015 rating decision became final. 38 U.S.C. § 7105(c); 38 C.F.R. §§ 3.104, 3.156(b), 20.302, 20.1103.

Since the April 2015 rating decision (final disallowance), additional evidence has been received in the form of VA treatment records, VA examination reports, private treatment records, and lay statements, which evidence is new because these were been previously submitted. The evidence received since the April 2015 rating decision is not material because it does not have any tendency to establish a current diagnosis for PTSD, so does not raise a reasonable possibility of substantiating the claim for service connection PTSD. Instead, an April 2017 VA examination report continued to show that the Veteran was not diagnosed with PTSD.

For the foregoing reasons, the Board finds that the evidence received since the April 2015 rating decision does not relate to a showing of a current PTSD diagnosis; thus, the evidence received since the April 2015 rating decision is not new and material evidence to reopen service connection for PTSD.

Service Connection Legal Criteria

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. § 1131; 38 C.F.R. § 3.303(a). Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). Service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in service disease or injury and the current disability.

With any claim for service connection (under any theory of entitlement), it is necessary for a current disability to be present. See Brammer v. Derwinski, 3 Vet. App. 223 (1992); see also McClain v. Nicholson, 21 Vet. App. 319 (2007) (service connection may be warranted if there was a disability present at any point during the claim period, even if it is not currently present); Romanowsky v. Shinseki, 26 Vet. App. 289 (2013) (when the record contains a recent diagnosis of disability immediately prior to a veteran filing a claim for benefits based on that disability, the report of diagnosis is relevant evidence that the Board must address in determining whether a current disability existed at the time the claim was filed or during its pendency).

Service connection may also be granted for a disability that is proximately due to or the result of a service-connected disability. See 38 C.F.R. § 3.310(a). When service connection is thus established for a secondary condition, the secondary condition shall be considered a part of the original condition. See id.; Harder v. Brown, 5 Vet. App. 183, 187 (1993). The controlling regulation has been interpreted to permit a grant of service connection not only for disability caused by a service connected disability, but for the degree of disability resulting from aggravation of a non-service-connected disability by a service-connected disability. See Allen v. Brown, 7 Vet. App. 439, 448 (1995). In other words, service connection may be granted for a disability found to be proximately due to, or the result of, a service-connected disease or injury. To prevail on the issue of secondary service causation, the record must show (1) evidence of a current disability, (2) evidence of a service-connected disability, and (3) medical nexus evidence establishing a connection between the current disability and the service connected disability. Wallin v. West, 11 Vet. App. 509, 512 (1998); Reiber v. Brown, 7 Vet. App. 513, 516-17 (1995).

Prior to death, the Veteran was diagnosed with degenerative arthritis of the cervical spine, which is a “chronic disease” under 38 C.F.R. § 3.309(a). Therefore, the presumptive provisions of 38 C.F.R. § 3.303(b) for “chronic” in-service symptoms and “continuous” post service symptoms apply. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).

Where the evidence shows a “chronic disease” in service or “continuity of symptoms” after service, the disease shall be presumed to have been incurred in service. For the showing of “chronic” disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. With chronic disease as such in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service-connected, unless clearly attributable to intercurrent causes. If a condition noted during service is not shown to be chronic, then generally, a showing of “continuity of symptoms” after service is required for service connection. 38 C.F.R. § 3.303(b).

Additionally, where a veteran served ninety days or more of active service, and certain chronic diseases, such as arthritis, become manifest to a degree of 10 percent or more within one year after the date of separation from such service, such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. 38 C.F.R. §§ 3.307, 3.309(a). While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time. Id.

2. Service connection for a sleeping disorder, to include obstructive sleep apnea

The appellant contends that the Veteran developed a sleeping disorder or sleep apnea as a result of active service and/or as a result of the service-connected bipolar disorder. See June 2016 claim. 

After a review of all the lay and medical evidence of record, the Board finds that the weight of the evidence demonstrates that prior to death, the Veteran was not diagnosed with a sleeping disorder or sleep apnea. Although VA treatment records reflect the Veteran complained of difficulty falling and staying asleep, an August 2016 VA treatment record shows that a sleep study was performed and revealed the Veteran did not have a sleeping disorder or sleep apnea, only primary snoring during sleep. Instead, an August 2016 VA mental health VA examination report shows the Veteran was found to have poor sleep hygiene rather than a sleeping disorder. Additionally, a December 2016 VA medical opinion reflects the VA examiner agreed with the August 2016 VA examiner’s conclusion that the Veteran did not have a sleeping disorder. The December 2016 VA examiner noted that the Veteran’s complaints of difficulty falling and staying asleep were related to poor sleep hygiene such as consuming caffeine late in the day, not being active during the day, and having a television on in the bedroom constantly. The December 2016 VA examiner opined that the Veteran did not have a separate sleeping disorder associated with the service-connected bipolar disorder. The VA examiner explained that one common symptom of people with bipolar disorder is sleep impairment, and in the Veteran’s case, he did not exhibit a separate sleeping disorder from the sleep impairment symptoms due to bipolar disorder.

As discussed above, with any claim for service connection, it is necessary for a current disability to be present. See Moore, 21 Vet. App. at 215; Brammer, 3 Vet. App. at 225; Rabideau, 2 Vet. App. at 143 44; McClain, 21 Vet. App. 319; Romanowsky, 26 Vet. App. 289. Because the weight of the evidence demonstrates that prior to death the Veteran was not diagnosed with a sleeping disorder or sleep apnea, the claim for service connection for a sleeping disorder, to include sleep apnea, must be denied.

3. Service connection for hepatitis C

The appellant asserts that the Veteran contracted hepatitis C during service through exposure to blood from fights and/or when he donated blood during service. See June 2016 claim; August 2016 VA examination report. The appellant also contends the Veteran was exposed to a fellow service member’s blood when his finger was cut off, and when he received vaccines during service. See November 2016 Notice of Disagreement.

To support a finding that the Veteran contracted hepatitis C in service, it must be shown that he was exposed to one of the medically recognized risk factors for contracting hepatitis C during that time. Risk factors include intravenous (IV) drug use, blood transfusions before 1992, hemodialysis, intranasal cocaine use, high-risk sexual activity, accidental exposure while a health care worker, and various kinds of percutaneous exposure such as tattoos, body piercing, acupuncture with non-sterile needles, and shared toothbrushes or razor blades, and immunization with a jet air gun injector. It is clarified that, despite the lack of any scientific evidence to document transmission of hepatitis C with air gun injectors, it is biologically possible. See Veterans Benefit Administration (VBA) Fast Letter 98-110 (Nov. 30, 1998).

Initially the Board finds that prior to death the Veteran was diagnosed with hepatitis C. An August 2016 VA examination report shows that the Veteran was diagnosed with hepatitis C and reported first being diagnosed in 1992. A December 1995 VA treatment record reflecting a history of hepatitis C is the earliest evidence of a confirmed hepatitis C diagnosis. 

After a review of the lay and medical evidence of record, the Board finds that a risk factor of hepatitis C, namely in-service air gun immunization was present in service. Service treatment records do not reflect that the Veteran donated blood during service, but show that he was involved in fights during service while intoxicated (due to willful misconduct). See e.g. February 1989 service treatment record; September 1989 service treatment record. Service treatment records also do not reflect any reports of being exposed to another service member’s blood. The evidence of record does not reflect any other in-service injury, disease, risk factors, or symptoms of hepatitis C present in service. Service treatment records do not show any history or reports of hepatitis C risk factors during service, or any other notations to suggest hepatitis C risk factors during service. Service treatment records do not indicate blood transfusions, hemodialysis, high-risk sexual activity, accidental exposure working as a health care worker, or percutaneous exposure. 

The Board further finds that the weight of the lay and medical evidence shows that the hepatitis C was not related to service, including to the in-service air gun inoculation. Though the Veteran was diagnosed with hepatitis C prior to death, the weight of the evidence, lay and medical, demonstrates no link between the onset of the hepatitis C to service. Post-service VA treatment records show the Veteran had multiple risk factors for hepatitis C such as intravenous drug use, intranasal cocaine use, high-risk sexual activity, and getting tattoos in the 1970s. See, e.g., December 1995 service treatment record; January 2000 VA treatment record; March 2000 VA treatment record; January 2003 VA treatment record. Neither the in-service risk factor of being involved in fights while intoxicated due to willful misconduct or the post-service risk factors can be used to support a claim for service connection for hepatitis C, and post-service risk factors affirmatively weigh against a claim for service connection because they tend to show non-service-related etiology of hepatitis C. Additionally, the Veteran denied any transfusions in a July 2015 VA treatment record, and the evidence of record shows the Veteran was homeless for a period of time, suggesting another post-service risk factor. See December 1999 VA treatment record.

The record includes an August 2016 VA examination report, which contains the VA examiner’s opinion that, based on the Veteran’s history and documented risk factors for hepatitis C, it is less likely than not that the Veteran contracted hepatitis C during service from being exposed to blood from fighting while intoxicated. The VA examiner explained that there are too many variables with regards to the Veteran’s history of fighting during service and possible exposure to blood and his ultimate hepatitis C infection. For example, the VA examiner noted that it is unknown with regards to any of the fights whether there was actually any exposure to blood or the amount of blood that the Veteran was exposed to; there is also no known route of transmission, even if there was sufficient blood exposure during any of the in-service fights. Furthermore, the VA examiner noted that it is unknown whether any of the individuals who the Veteran fought with were in fact infected with hepatitis C at the time of the fight. 

In contrast, the August 2016 VA examiner noted the Veteran had other risk factors that are more likely to be the cause of his hepatitis C infection such as tattoos dating back to the 1970s, a history of intranasal drug use, and multiple sexual partners, which are well-known risk factors to the transmission of hepatitis C; the VA examiner noted that there are clearly identifiable routes of transmission with these other risk factors, particularly with the history of tattoos dating back to the 1970s. Therefore, the VA examiner opined that it is much more likely that the Veteran’s hepatitis C was due to his history of tattoos, multiple sexual partners, or intranasal drug use, to a much greater degree than to any possible blood exposure from fighting during service.

The record also includes a December 2016 VA addendum opinion, wherein the December 2016 VA examiner addressed the appellant’s allegation that the Veteran was exposed to another servicemember’s blood when that person’s finger was cut off and the Veteran was splattered with blood and/or the use of air guns to give vaccinations in service. With respect to the contention that the Veteran was exposed to hepatitis C from the use of air gun inoculations, the VA examiner cited VBA Fast Letter 98-110, which mentions this as being a plausible theory, however, the VA examiner stated that all risk factors for contracting hepatitis C must be objectively considered in order to determine the likely etiology of the Veteran’s hepatitis C. The December 2016 VA examiner endorsed the August 2016 VA examiner’s opinion as the rationale provided therein was very complete. When considering all of the risk factors for contracting hepatitis C, the December 2016 VA examiner opined that the Veteran’s hepatitis C is less likely than not a result of the claimed in-service risk factors, including exposure to the another servicemember’s blood and receiving vaccinations by air gun, based on the same rationale set forth in the opinion contained in the August 2016 VA examination report.

The Veteran, during his life, and the appellant, to the extent she is related what the Veteran told her, are competent to report in-service risk factors (i.e., air gun immunizations). Both are competent to report some of the post-service symptoms that were later diagnosed as hepatitis C. Under the facts of this case, which include post-service onset of hepatitis C risk factors, symptoms, and diagnosis, with a history of drug abuse prior to the diagnosis, the appellant is not competent to relate the hepatitis C to the in-service risk factors of an air-gun inoculation, in-service fights while intoxicated, or the reported exposure to another service member’s blood. Although the appellant asserts that the Veteran’s hepatitis C was related to the above in-service risk factors, the appellant is a lay person and, under the facts of this particular case that include in-service fighting while intoxicated (that is willful misconduct) and post-service risk factors that include intravenous and intranasal drug abuse and high-risk sexual activity, does not have the requisite medical training or credentials to be able to render a competent medical opinion regarding the cause of the hepatitis C. The etiology of the Veteran’s hepatitis C is a complex medical etiological question involving multiple risk factors, most of which occurred after service. Such disability is diagnosed primarily on clinical findings and physiological testing. Thus, while the appellant is competent to report some hepatitis C symptoms the Veteran experienced, under the facts of this case, the appellant is not competent to opine on whether there is a link between the Veteran’s hepatitis C and the claimed in-service risk factors, including the in-service air-gun inoculations. 

Based on the foregoing, the Board finds that a preponderance of the lay and medical evidence demonstrates the Veteran’s hepatitis C diagnosed prior to death was the result of the history of intravenous drug use, intranasal cocaine use, and high-risk sexual activity after service, and getting tattoos in the 1970s prior to service, and is not otherwise related to active service. For these reasons, the Board finds that the weight of the evidence demonstrates that the hepatitis C diagnosed prior to death is not related to service. As a preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application, and the claim must be denied. See 38 U.S.C. § 5107; 38 C.F.R. § 3.102. 

4. Service connection for erectile dysfunction

The appellant asserts that prior to death the Veteran developed erectile dysfunction as a result of the service-connected bipolar disorder and/or lumbar spine disability. Alternatively, the appellant argues that medication prescribed to treat any of the Veteran’s service-connected disabilities caused him to develop erectile dysfunction. See June 2016 claim.

At the outset, the Board finds that prior to death the Veteran was diagnosed with erectile dysfunction. An August 2016 VA examination report reflects a diagnosis of erectile dysfunction based on a reporting the onset of symptoms over the course of the previous year.

After a review of all the evidence of record, lay and medical, the Board finds that the diagnosed erectile dysfunction did not have its onset during service, and was not otherwise caused by service. Service treatment records do not show any complaints, symptoms, diagnosis, or treatment for erectile dysfunction. A September 1989 service separation examination shows the Veteran’s genitourinary system was found to be clinically normal. The weight of the evidence shows that the diagnosed erectile dysfunction had its onset after active service and that the Veteran was not diagnosed with erectile dysfunction until December 2015.

The Board further finds that the evidence is against finding that the Veteran’s erectile dysfunction was either caused or worsened beyond its normal progression by the service-connected bipolar disorder and/or the lumbar spine disability. Prior to death, the Veteran underwent a VA examination in August 2016, during which he reported erectile dysfunction issues over the course of the past year. The August 2016 VA examination report contains the VA examiner’s opinion that it is less likely than not that the erectile dysfunction was due to or the result of the service-connected bipolar disorder, including medications taken to treat the bipolar disorder. 

Additionally, the VA examiner opined that it is less likely than not that the erectile dysfunction was caused or worsened beyond its normal progression by the service-connected lumbar spine disability. The VA examiner explained that the Veteran had issues with bipolar disorder and the lumbar spine disability for a number of years, but had only developed erectile dysfunction in the past year. The VA examiner noted that the evidence did not support that medications taken to treat the bipolar disorder, the lumbar spine disability, or for any of the Veteran’s other service-connected disabilities, ultimately resulted in the development of erectile dysfunction. 

Furthermore, the evidence did not support that the erectile dysfunction had been worsened beyond its normal progression by the lumbar spine disability, bipolar disorder, or medications taken for any service-connected disabilities. The VA examiner noted that the Veteran had described erectile dysfunction that was independent from any medications taken for service-connected disabilities, and from the lumbar spine disability and the bipolar disorder. 

As the evidence of record does not contain a competent medical opinion establishing a medical nexus between the diagnosed erectile dysfunction and an injury, disease, or event during service, or a medical nexus between the erectile dysfunction and the service-connected bipolar disorder, the service-connected lumbar spine disability, or medications taken to treat any of the service-connected disabilities, the Board finds that the weight of the evidence is against service connection for erectile dysfunction, and the claim must be denied.

5. Service connection for GERD

The appellant contends that the Veteran developed GERD as a result of military service. Alternatively, the appellant asserts the Veteran developed GERD as a result of the service-connected bipolar disorder and/or medications taken to treat other service-connected disabilities. See June 2016 claim. Initially, the Board finds that prior to death the Veteran was diagnosed with GERD. See July 2015 VA treatment record.

After a review of all the evidence or record, lay and medical, the Board finds that the diagnosed GERD did not have its onset during service, and was not otherwise caused by service. Service treatment records do not show any complaints, symptoms, diagnosis, or treatment for GERD. A September 1989 service separation examination shows the Veteran’s abdomen and viscera were found to be clinically normal. On a September 1989 Report of Medical History, the Veteran denied symptoms of stomach, liver, or intestinal trouble. 

Next, the Board finds that the weight of the evidence is against finding that the Veteran’s GERD was either caused or worsened beyond its normal progression by the service-connected bipolar disorder. Prior to death, the Veteran underwent a VA examination in August 2016, the examination report for which contains the VA examiner’s opinion that it is less likely than not that the Veteran’s GERD was the result of the service-connected bipolar disorder or medications taken to treat any of the service-connected disabilities. The VA examiner explained that GERD is the result of a decrease in lower esophageal sphincter tone, often in the presence of increased gastric acidity and decreased gastric motility. The VA examiner explained that the evidence did not support finding that the bipolar disorder or any medications that the Veteran had taken had caused or worsened the GERD.

As the evidence of record does not contain a competent medical opinion establishing a medical nexus between the Veteran’s GERD and an injury, disease, or event during service, or a medical nexus between the GERD and the service-connected bipolar disorder, the Board finds that weight of the evidence is against service connection for GERD, and the claim must be denied.

6. Service connection for a cervical spine disorder

The appellant asserts that the Veteran injured his neck during service in 1989 when he was pinned under a tank track, for which he received treatment while stationed in Germany. Alternatively, the appellant contends that the Veteran developed a cervical spine disorder as a result of the service-connected lumbar spine disability and/or the service-connected onychomycosis in the toenails. See June 2016 claim. 

Initially, the Board finds that prior to death the Veteran was diagnosed with degenerative disc disease, spondylosis, and degenerative arthritis of the cervical spine. See January 2000 VA treatment record.

After a review of all the evidence or record, lay and medical, the Board finds that the diagnosed cervical spine disorder did not have its onset during service, and was not otherwise caused by service. Service treatment records do not show any complaints, symptoms, diagnosis, or treatment for neck problems or any neck injuries, including no chronic symptoms of arthritis in the cervical spine during service. A September 1989 service separation examination report shows the Veteran’s neck was found to be clinically normal. On a corresponding September 1989 Report of Medical History, the Veteran endorsed a history of painful joints described as right hand pain associated with cold temperatures; the Veteran also endorsed a history of a head injury described as getting hit on the head the prior week during a fight. The September 1989 Report of Medical History did not note any history or complaints by the Veteran of neck pain or a neck injury. As such, the above evidence weighs against a finding of chronic symptoms of a cervical spine disorder during service.

The weight of the lay and medical evidence is also against a finding of continuous symptoms of a cervical spine disorder since service separation, including arthritis manifesting to 10 percent within one year of service; therefore, presumptive service connection under the provisions of 38 C.F.R. § 3.303(b) is not warranted based on “chronic” in-service symptoms, “continuous” post service symptoms, or arthritis within one year of service. As discussed above, neither the service treatment records nor the September 1989 service separation examination indicated any history or findings or diagnosis for a cervical spine disorder. The earliest evidence of a cervical spine disorder is not indicated until 2000 in a January 2000 VA treatment record containing X-rays showing degenerative disc disease, spondylosis, and degenerative arthritis in the cervical spine, nearly 10 years after service separation and nine years outside of the applicable presumptive period.

On the question of direct nexus between the current cervical spine disorder and service, the Board finds that the preponderance of the lay and medical evidence is against a finding that the diagnosed cervical spine disorder was causally related to service. The weight of the evidence shows that the cervical spine disorder had its onset after active service, that the Veteran was not treated for the cervical spine disorder until after service, and was not diagnosed with arthritis in the cervical spine until January 2000.

The Board further finds that the weight of the evidence shows that a cervical spine disorder was not caused or worsened beyond its normal progression by the service-connected lumbar spine disability or the onychomycosis in the toenails. Prior to death, the Veteran underwent a VA examination in August 2016, the examination report for which contains the VA examiner’s opinion that it is less likely than not that the cervical spine disorder was caused or worsened beyond its normal progression by the service-connected lumbar spine disability. The VA examiner explained that the evidence did not demonstrate that the lumbar spine disability had caused any change in the Veteran’s biomechanics that was placing particular strain or load-bearing upon the cervical spine in such a manner as to have caused the cervical spine disorder.

In an October 2016 VA addendum opinion, the VA examiner opined that it is less likely than not that the Veteran’s cervical spine disorder was caused or worsened beyond its normal progression by the service-connected onychomycosis of the toenails, including scars associated with the onychomycosis. The VA examiner explained that there was no relationship between the onychomycosis and associated scars and the cervical spine disorder; the cervical spine arthritis was not related to any skin and nail changes in the feet as these were all separate issues and entities with no relationship between one another.

As the evidence of record does not contain a competent medical opinion establishing a medical nexus between the diagnosed cervical spine disorder and an injury, disease, or event during service, or between the cervical spine disorder and the service-connected lumbar spine disability or the service-connected onychomycosis in the toenails, the Board finds that the weight of the evidence is against service connection for a cervical spine disorder, and the claim must be denied.

7. Temporary total disability rating for convalescence beyond November 1, 2016

In a September 2017 rating decision, the RO assigned a temporary 100 percent rating for the service-connected onychomycosis, effective from August 10, 2016 to October 1, 2016, based on revision ablation surgery necessitating convalescence. In a January 2018 rating decision, the RO extended the temporary total rating to November 1, 2016, based on evidence showing further convalescence was needed. The appellant essentially contends that the Veteran required an additional period of convalescence beyond November 1, 2016, and submitted evidence of further treatment following the revision ablation surgery to support the assertion. See April 2017 private treatment record.

Temporary total disability ratings for convalescence are governed by 38 C.F.R. § 4.30. Temporary total ratings will be assigned from the date of hospital admission and continue for one, two, or three months from the first day of the month following hospital discharge when treatment of a service-connected disability results in: (1) surgery necessitating at least one month of convalescence; (2) surgery with severe postoperative residuals such as incompletely healed surgical wounds, stumps of recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, or the necessity for house confinement, or the necessity for continued use of a wheelchair or crutches (regular weight-bearing prohibited); or (3) immobilization by cast, without surgery, of one major joint or more. 38 C.F.R. § 4.30(a). 

Total ratings for convalescence may be extended for one, two, or three months beyond the initial termination date for any of the three reasons set forth above. Extensions of one or more months up to six months beyond the initial six month period may be made for reasons (2) or (3) above. 38 C.F.R. § 4.30(b). Pursuant to 38 C.F.R. § 4.30, the disability requiring hospitalization or convalescence must be service connected. 

Notations in the medical record as to a veteran’s incapacity to work after surgery must be taken into account in the evaluation of a claim brought under the provisions of 38 C.F.R. § 4.30. Seals v. Brown, 8 Vet. App. 291, 296-97 (1995); Felden v. West, 11 Vet. App. 427, 430 (1998). Furthermore, the term “convalescence” does not necessarily entail in-home recovery.

After a review of all the evidence, lay and medical, the Board finds that the weight of the evidence is against finding that the revision ablation surgery performed on August 10, 2016 manifested severe postoperative residuals so as to require an extension of convalescence beyond November 1, 2016. The Veteran underwent a revision ablation surgical operation on August 10, 2016, for which he was discharged that same day. See August 2016 private treatment record. Private treatment records show the Veteran was seen for follow up appointments and was observed to have unhealed surgical wounds with areas of exposed bone through October 5, 2016. Subsequent VA and private treatment records show the wounds from the revision ablation surgery had further healed, that some decreased range of motion and sensation had been noted in the fingers, but no further observations of areas of exposed bone had been noted. See January 2017 VA treatment record; April 2017 private treatment record.

In sum, the evidence demonstrates that revision ablation surgery performed on August 10, 2016 did not necessitate a period of convalescence beyond November 1, 2016. Following the ablation surgery, the Veteran was able to attend doctor appointments and the August 2016 VA examinations. Further, there is no indication from private or VA treatment records, or the appellant, that the revision ablation surgery required bed rest, therapeutic immobilization of the hands, or necessitated house confinement.

For these reasons, the Board finds that the weight of the evidence is against extending the temporary total rating for onychomycosis beyond November 1, 2016, and that the criteria for a temporary total disability rating for convalescence beyond November 1, 2016 have not been met. 38 U.S.C. §§ 1155, 1156; 38 C.F.R. § 4.30. 

8. Special monthly compensation based on housebound status, beyond November 1, 2016 

The issue of whether the appellant is entitled to an extension of special monthly compensation based on housebound status under the provisions of 38 U.S.C. § 1114(s)(1) and 38 C.F.R. § 3.350(i) beyond November 1, 2016 is intertwined with the temporary total disability rating issue decided above. The appellant is currently in receipt of special monthly compensation benefits for the period from August 10, 2016 to November 1, 2016.

Special monthly compensation is payable at the housebound rate where the claimant has a single service-connected disability rated as totally disabling and one or more distinct service-connected disabilities, which are independently ratable at 60 percent or more and involve different anatomical segments or bodily systems. 38 U.S.C. § 1114(s)(1); 38 C.F.R. § 3.350(i). In this case, the requirement of a single service-connected disability rated as totally disabling was met by the temporary total disability rating assigned for the service-connected onychomycosis based on convalescence for revision ablation surgery.

Following the denial of an extension of the temporary total disability rating for onychomycosis beyond November 1, 2016, the appeal for an extension of the corresponding special monthly compensation under the provisions of 38 U.S.C. § 1114(s)(1) and 38 C.F.R. § 3.350(i) beyond November 1, 2016 fails as a matter of law because there is no service-connected disability rated at 100 percent. Moreover, the appellant has not asserted, and the evidence does not otherwise reflect, that the Veteran was actually housebound due to service-connected disabilities. In fact, the appellant’s claim for an extended temporary total disability rating was based on outpatient follow up appointments that occurred after November 1, 2016. Consequently, there remain no questions of law or fact to be decided regarding special monthly compensation based on housebound status beyond November 1, 2016. See Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (where the law is dispositive, the claim must be denied due to lack of legal merit).

9. Whether it was proper for the RO to find that there was CUE in assigning a separate disability rating for linear scars of the hands and feet

10. Whether it was proper for the RO to find that there was CUE in assigning a separate disability rating for scars of the hands and feet

The appellant objects to the RO’s finding in a July 2016 rating decision that there was CUE in the December 2015 rating decision when the RO assigned a separate noncompensable disability rating for linear scars of the hands and feet and a separate 20 percent disability rating for scars of the hands and feet. Upon making this CUE finding, the RO discontinued the separate ratings for the linear scars and scars, and combined rating of the linear scars of the hands and feet and scars of the hands and feet with onychomycosis of the fingernails and toenails. A February 2017 rating decision combined evaluation of the linear scars of the hands and feet and scars of the hands and feet with the onychomycosis of the fingernails and toenails effective May 1, 2017.

Previous determinations that are final and binding, including decisions of service connection and other matters, will be accepted as correct in the absence of CUE. Where evidence establishes such error, the prior rating decision will be reversed or amended. For the purpose of authorizing benefits, the rating or other adjudicatory decision which constitutes a reversal of a prior decision on the grounds of CUE has the same effect as if the corrected decision had been made on the date of the reversed decision. 38 C.F.R. § 3.105(a).

CUE is a very specific and rare kind of “error.” It is the kind of error, of fact or of law, that when called to the attention of later reviewers compels the conclusion, to which reasonable minds could not differ, that the result would have been manifestly different but for the error. Simply to claim CUE on the basis that previous adjudications had improperly weighed and evaluated the evidence can never rise to the stringent definition of CUE. Similarly, neither can broad-brush allegations of “failure to follow the regulations” or “failure to give due process,” or any other general, nonspecific claim of “error.” Fugo v. Brown, 6 Vet. App. 40, 43-44 (1993). In addition, failure to address a specific regulatory provision involves harmless error unless the outcome would have been manifestly different. Id. at 44.

The Court has held that there is a three-pronged test to determine whether CUE is present in a prior determination: (1) “[e]ither the correct facts, as they were known at the time, were not before the adjudicator (i.e., more than a simple disagreement as to how the facts were weighed or evaluated) or the statutory or regulatory provisions extant at the time were incorrectly applied,” (2) the error must be “undebatable” and of the sort “which, had it not been made, would have manifestly changed the outcome at the time it was made,” and (3) a determination that there was CUE must be based on the record and law that existed at the time of the prior adjudication in question. Damrel v. Brown, 6 Vet. App. 242, 245 (1994) (quoting Russell v. Principi, 3 Vet. App. 310, 313-14 (1992) (en banc)).

If an appellant wishes to reasonably raise a claim of CUE, there must be some degree of specificity as to what the alleged error is and, unless it is the kind of error that, if true, would be CUE on its face, persuasive reasons must be given as to why one would be compelled to reach the conclusion, to which reasonable minds could not differ, that the result would have been manifestly different but for the alleged error. Bustos v. West, 179 F.3d 1378, 1381 (Fed. Cir. 1999), cert. denied, 528 U.S. 967 (1999); Fugo, 6 Vet. App. at 43-44. If the error alleged is not the type of error that, if true, would be CUE on its face, if the appellant is only asserting disagreement with how the RO evaluated the facts before it, or if the appellant has not expressed with specificity how the application of cited laws and regulations would dictate a “manifestly different” result, the claim must be denied or the appeal to the Board terminated because of the absence of legal merit or the lack of entitlement under the law. Luallen v. Brown, 8 Vet. App. 92 (1995); Caffrey v. Brown, 6 Vet. App. 377, 384 (1994). Further, VA’s failure in the duty to assist cannot constitute CUE. See Cook v. Principi, 318 F.3d 1334, 1346 (Fed. Cir. 2003).

In this case, the appellant submitted a claim for a TDIU in September 2014, which the RO construed to also be a claim for increased ratings of all service-connected disabilities. An April 2015 rating decision, in pertinent part, continued the 60 percent disability rating assigned for the service-connected onychomycosis of the fingernails and toenails, to which the appellant submitted a Notice of Disagreement in May 2015. In an August 2015 written statement, the appellant withdrew the May 2015 Notice of Disagreement as to the issue of an increased rating in excess of 60 percent for the onychomycosis of the fingernails and toenails. 

Nonetheless, the December 2015 rating decision proposed to decrease the 60 percent rating for onychomycosis of the fingernails and toenails to 10 percent, assign a separate 20 percent rating for associated scars of the hands and feet, and assign a noncompensable rating for associated linear scars of the hands and feet. An April 2016 rating decision implemented the decreased 10 percent rating for onychomycosis of the fingernails and toenails effective July 1, 2016, to which the appellant submitted a Notice of Disagreement in June 2016. 

In the July 2016 rating decision, the RO found that CUE had been committed under 38 C.F.R. § 3.400 when the RO assigned disability ratings for linear scars of the hands and feet and scars of the hands and feet separate from the disability rating assigned for onychomycosis of the fingernails and toenails, despite the fact that 38 C.F.R. § 4.118, Diagnostic Code 7806 under which onychomycosis is rated instructs rating either the onychomycosis or the scars, whichever is the predominant disability. Accordingly, the RO reinstated the 60 percent rating for onychomycosis effective July 1, 2016 (the date the rating was previously reduced to 10 percent) and discontinued the separate ratings for the linear scars of the hands and feet and the scars of the hands and feet, and combined rating of the scars with rating of onychomycosis as the RO found the linear scars and scars were not the predominant disability. A February 2017 rating decision combined rating of the linear scars of the hands and feet and scars of the hands and feet with the onychomycosis of the fingernails and toenails effective May 1, 2017.

Per the law in effect at the time of the December 2015 RO rating decision, the rating criteria set forth under 38 C.F.R. § 4.118, Diagnostic Code 7806, which the service-connected onychomycosis was rated, states the onychomycosis was to be rated pursuant to the percentage of the entire body or exposed body areas affected by the skin condition and/or by the use of systemic therapy/immunosuppressive drugs or as disfigurement of the head, face, or neck (under Diagnostic Code 7800), or scars (under Diagnostic Codes 7801, 7802, 7803, 7804, or 7805), depending upon the predominant disability; the rating criteria did not permit assigning separate disability ratings for the linear scars of the hands and feet and the scars of the hands and feet separately from the disability rating assigned for the onychomycosis.

The above establishes, without debate, that the RO in December 2015 incorrectly applied the applicable laws and regulations existing at the time, specifically 38 C.F.R. § 4.118, Diagnostic Code 7806, when it assigned separate disability ratings for linear scars of the hands and feet and scars of the hands and feet. Had the RO properly applied 38 C.F.R. § 4.118, Diagnostic Code 7806, the linear scars of the hands and feet and the scars of the hands and feet would have continued to be rated with onychomycosis of the fingernails and toenails. 

For the foregoing reasons, the Board finds that the December 26, 2015 RO rating decision assigning separate disability ratings for linear scars of the hands and feet and scars of the hands and feet was clearly and unmistakably erroneous, and it was proper for the RO in the July 25, 2016 rating decision to discontinue the separate ratings and combine the ratings for the linear scars of the hands and feet and the scars of the hands and feet with the disability rating assigned for the onychomycosis of the fingernails and toenails. 38 U.S.C. § 5109A; 38 C.F.R. § 3.105.

Disability Rating Legal Criteria

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) found in 38 C.F.R. Part 4. 38 U.S.C. § 1155. It is not expected that all cases will show all the findings specified; however, findings sufficiently characteristic to identify the disease and the disability therefrom and coordination of rating with impairment of function will be expected in all instances. 38 C.F.R. § 4.21.

Where there is a question as to which of two disability ratings shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. It is the defined and consistently applied policy of VA to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant. 38 C.F.R. § 4.3.

When evaluating disabilities of the musculoskeletal system, 38 C.F.R. § 4.40 allows for consideration of functional loss due to pain and weakness causing additional disability beyond that reflected on range of motion measurements. DeLuca v. Brown, 8 Vet. App. 202 (1995); Mitchell v. Shinseki, 25 Vet. App. 32 (2011). Further, 38 C.F.R. § 4.45 provides that consideration also be given to decreased movement, weakened movement, excess fatigability, incoordination, and pain on movement, swelling, and deformity or atrophy of disuse. Painful motion is considered limited motion at the point that pain actually sets in. See VAOPGCPREC 9-98.

11. Rating Onychomycosis

As discussed above, the appellant previously withdrew an appeal for an increased disability rating in excess of 60 percent for onychomycosis of the fingernails and toenails in May 2015. In the July 2016 rating decision discussed above, the RO reinstated the 60 percent rating for onychomycosis effective July 1, 2016 (the date the rating was previously reduced to 10 percent) and discontinued the separate ratings for the linear scars of the hands and feet and the scars of the hands and feet, and combined rating of the scars with rating of onychomycosis. A February 2017 rating decision combined evaluation of the linear scars of the hands and feet and scars of the hands and feet with the 60 percent rating assigned for onychomycosis of the fingernails and toenails under 38 C.F.R. § 4.118, Diagnostic Code 7806, effective May 1, 2017. The appellant disagrees with the 60 percent rating assigned from May 1, 2017 for onychomycosis of the fingernails and toenails, linear scars of the hands and feet, and scars of the hands and feet. See July 2017 Notice of Disagreement.

Diagnostic Code 7806 provides ratings for dermatitis or eczema. Dermatitis or eczema is to be rated under either the criteria under Diagnostic Code 7806 or to be rated as disfigurement of the head, face, or neck (Diagnostic Code 7800) or scars (Diagnostic Codes 7801, 7802, 7804, or 7805), depending upon the predominant disability. 38 C.F.R. § 4.118. Diagnostic Code 7806 provides a noncompensable (0 percent) rating for dermatitis or eczema that involves less than 5 percent of the entire body or less than 5 percent of exposed areas affected, and no more than topical therapy is required during the past 12-month period. A 10 percent rating is assigned for dermatitis or eczema that involves at least 5 percent, but less than 20 percent, of the entire body, or at least 5 percent, but less than 20 percent, of exposed areas affected, or intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of less than six weeks during the past 12-month period. A 30 percent rating is assigned for dermatitis or eczema that involves 20 to 40 percent of the entire body or 20 to 40 percent of exposed areas affected, or systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of six weeks or more, but not constantly, during the past 12-month period. A 60 percent rating is assigned for dermatitis or eczema that involves more than 40 percent of the entire body or more than 40 percent of exposed areas affected, or; constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs required during the past 12-month period. 38 C.F.R. § 4.118.

For the relevant rating period on appeal from May 1, 2017 until the Veteran’s death in July 2018, the maximum 60 percent disability rating was assigned for onychomycosis of the fingernails and toenails under Diagnostic Code 7806. 38 C.F.R. § 4.118. Because the maximum rating under Diagnostic Code 7806 was in effect for this period, an increased disability rating in excess of 60 percent is not available.

After a review of all the evidence, lay and medical, the Board finds that the onychomycosis had more nearly approximated constant or near-continuous systemic therapy, such as corticosteroids or other immunosuppressive drugs required during a 12 month period. The lay and medical evidence of record demonstrates that during the relevant period on appeal, the onychomycosis affected the fingernails and toenails of the hands and feet. A November 2015 VA examination report shows the onychomycosis did not cause scarring or disfigurement of the head, face, or neck. Additionally, the onychomycosis was not treated with oral, topical, or systemic medications. The November 2015 VA examination report also notes findings that the skin condition affected at least 5 but less than 20 percent of the total body area and exposed body area (criteria for a 10 percent rating). The VA examiner also identified four linear scars, each measuring 1 centimeter long, located on the right thumb nailbed, left thumb nailbed, right great toe nailbed, and left great toe nailbed; all four scars were found to be painful, but not unstable, and neither of the scars caused disfigurement of the head, face, or neck, were due to burns, or caused limitation of function. Despite the generally mild findings contained in the November 2015 VA examination report, the Board notes that other VA treatment records show that use of topical treatment had not been effective in treating the onychomycosis and that the Veteran’s extensive history of non-service-connected liver problems precluded use of systemic therapy to treat the onychomycosis. For this reason, the Board finds the onychomycosis had more nearly approximated the 60 percent rating criteria under Diagnostic Code 7806.

With respect to the onychomycosis, the Board finds that an increased disability rating is not warranted as the appellant is the maximum 60 percent rating under Diagnostic Code 7806 has been provided for the rating period. Additionally, the only Diagnostic Codes that allow for a disability rating in excess of 60 percent are Diagnostic Code 7800, which pertains to burn scars of the head, face, or neck, and Diagnostic Code 7817 which pertains to exfoliative dermatitis. 38 C.F.R. § 4.118. However, the evidence shows the linear scars of the hands and feet and scars of the hands and feet were not burn scars of the head, face, or neck, and the evidence does not show that the onychomycosis had manifested in symptoms more nearly approximating exfoliative dermatitis. For these reasons, the Board finds that the preponderance of the evidence is against the appeal for an increased disability rating for onychomycosis in excess of 60 percent for the period from May 1, 2017 forward to July 2018. 38 U.S.C. § 1155; 38 C.F.R. §§ 4.3, 4.7, 4.118, Diagnostic Code 7806. 

12. Rating the Lumbar Spine Disability

For the entire initial rating period on appeal from June 6, 2016, a 10 percent disability rating was in effect for the lumbar spine disability under the General Rating Formula. See 38 C.F.R. § 4.71a, Diagnostic Code 5237. The appellant contends that a higher initial disability rating for the lumbar spine disability is warranted as the Veteran experienced frequent incapacitating episodes that lasted approximately two days. See November 2016 Notice of Disagreement.

Disabilities of the spine are rated under the General Rating Formula for Diseases and Injuries of the Spine for Diagnostic Codes 5235 to 5243, unless 5243 is rated under the Formula for Rating Intervertebral Disc Syndrome (IVDS) Based on Incapacitating Episodes (IVDS Rating Formula). Ratings under the General Rating Formula are made with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease.

The General Rating Formula provides a 10 percent disability rating for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or, combined range-of-motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. 

A 20 percent rating is provided for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range-of-motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. 

A 40 percent disability rating is provided for forward flexion of the thoracolumbar spine 30 degrees or less, or favorable ankylosis of the entire thoracolumbar spine. 

A 50 percent disability rating is assigned for unfavorable ankylosis of the entire thoracolumbar spine. A 100 percent disability rating is assigned for unfavorable ankylosis of the entire spine. 

Note (1) to the rating formula specifies that any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, should be separately rated under an appropriate diagnostic code.

Note (2) (See also Plate V) provides that, for VA compensation purposes, normal forward flexion of the lumbar spine is zero to 90 degrees, extension is zero to 30 degrees, left and right lateral flexion are zero to 30 degrees, and left and right lateral rotation are zero to 30 degrees. The combined range-of-motion refers to the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation. The normal combined range-of-motion of the lumbar spine is 240 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range-of-motion.

Note (3) provides that, in exceptional cases, an examiner may state, that because of age, body habitus, neurologic disease, or other factors not the result of disease or injury of the spine, the range-of-motion of the spine in a particular individual should be considered normal for that individual, even though it does not conform to the normal range-of-motion stated in Note (2). Provided that the examiner supplies an explanation, the examiner’s assessment that the range-of-motion is normal for that individual will be accepted.

Note (4) instructs to round each range-of-motion measurement to the nearest five degrees.

Note (5) provides that, for VA compensation purposes, unfavorable ankylosis is a condition in which the entire lumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. Fixation of a spinal segment in neutral position (zero degrees) always represents favorable ankylosis. 

Under Diagnostic Code 5243 (Intervertebral Disc Syndrome), a 10 percent disability rating is assigned with incapacitating episodes having a total duration of at least 1 weeks but less than 2 weeks during the past 12 months; a 20 percent disability rating is assigned with incapacitating episodes having a total duration of at least 2 weeks but less than 4 weeks during the past 12 months; a 40 percent disability rating is assigned with incapacitating episodes having a total duration of at least 4 weeks but less than 6 weeks during the past 12 months; and a maximum 60 percent disability rating is assigned with incapacitating episodes having a total duration of at least 6 weeks during the past 12 months. 

Note (1) provides that an incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. 

Note (2) provides that if intervertebral disc syndrome is present in more than one spinal segment, provided that the effects in each spinal segment are clearly distinct, each segment should be evaluated on the basis of incapacitating episodes or under the General Rating Formula for Diseases and Injuries of the Spine, whichever method results in a higher rating for that segment.

After a review of all the evidence, lay and medical, the Board finds that for the entire rating period on appeal from June 6, 2016 to July 2018 the criteria for a higher initial disability rating in excess of 10 percent for the lumbar spine disability had not been met or more nearly approximated. Throughout the entire rating period on appeal from January 21, 2016, the lumbar spine disability had been manifested by pain and limitation of forward flexion greater than 60 degrees, without ankylosis (criteria for a 40 percent rating), limitation of forward flexion to 60 degrees or less (criteria for a 20 percent rating), a combined range of motion in the thoracolumbar spine less than 120 degrees (criteria for a 20 percent rating), muscle spasms, localized tenderness, or guarding severe enough to result in an abnormal gait or abnormal spinal contour (criteria for a 20 percent rating), or incapacitating episodes requiring physician ordered bed rest having a total duration of at least two weeks during a 12 month period (criteria for a 20 percent rating).

A September 2015 private treatment record reflects the Veteran complained of worsening back pain over time that prevented him from twisting or bending his back. Upon examination, forward flexion in the lumbar spine was measured to 110 degrees of forward flexion and the VA provider noted that all movements caused some mild back pain.

The Veteran underwent a VA examination in August 2016, during which he reported low back pain, stiffness, tightness affecting the lumbar spine; the Veteran did not report any periods of incapacity in the past year due to the lumbar spine disability. The August 2016 VA examination report shows ranges of motion in the lumbar spine were all normal and flexion in the thoracolumbar spine was measured to 90 degrees, with a combined range of motion of 215 degrees, with pain noted on examination that does not cause functional loss. The VA examiner also noted negative findings for muscle spasms, localized tenderness, or guarding severe enough to result in an abnormal gait or abnormal spinal contour. The VA examiner noted positive findings for IVDS, but noted negative findings for episodes requiring physician ordered bed rest.

A September 2017 VA treatment record shows the Veteran reported occasional low back pain with radiation to his legs when standing, but notes that the back pain was not his main concern at the time. Examination of the Veteran revealed pain with palpation lower lumbar spine directly over the spine and paraspinally with discomfort on palpation. Although the appellant asserts the Veteran experienced incapacitating episodes due to back pain, for which a physician directed the Veteran to remain in bed, VA and private treatment records do not support incapacitating episodes requiring physician ordered bed rest having a total duration of at least two weeks during a 12 month period.

Based on the foregoing, the Board finds that the preponderance of the evidence is against the appeal for a higher initial disability rating for the lumbar spine disability in excess of 10 percent for the entire initial rating period on appeal from June 6, 2016. 38 U.S.C. § 1155; 38 C.F.R. §§ 4.3, 4.7.

13. Rating the right lower extremity radiculopathy

14. Rating the left lower extremity radiculopathy

For the entire initial rating period from June 6, 2016, the right and left lower extremity radiculopathies had been rated at 10 percent disabling under the criteria at 38 C.F.R. § 4.124a, Diagnostic Code 8520, for mild incomplete paralysis of the L1-L2 nerve root. The appellant generally asserts that higher initial disability ratings are warranted for the right and left lower extremity radiculopathies due to episodes of flare ups that caused intense pain and tingling for two or three days at a time. See November 2016 Notice of Disagreement. 

Diagnostic Code 8520 provides the rating criteria for paralysis of the sciatic nerve. Disability ratings of 10, 20, and 40 percent are warranted, respectively, for mild, moderate, and moderately severe incomplete paralysis of the sciatic nerve. A disability rating of 60 percent is warranted for severe incomplete paralysis with marked muscle atrophy. An 80 percent rating is warranted with complete paralysis of the sciatic nerve. 38 C.F.R. § 4.124(a).

The term “incomplete paralysis” indicates a degree of lost or impaired function substantially less than the type picture for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild or at most, the moderate degree. See 38 C.F.R. § 4.124a.

After review of the lay and medical evidence of record, the Board finds the weight of the evidence is against finding that the right and left lower extremity radiculopathies more nearly approximated moderate incomplete paralysis of the sciatic nerve, so as to warrant higher 20 percent ratings for the entire initial rating period from June 6, 2016 to July 2018. For the initial rating period from June 6, 2016, the right and left lower extremity radiculopathies had been manifested by mild intermittent pain, paresthesias, dysesthesias, and numbness in the right and left lower extremities involving the sciatic nerve, more nearly approximating mild incomplete paralysis of the sciatic nerve.

A September 2015 VA treatment record shows the Veteran reported intermittent numbness in the legs and occasional tingling and an uncomfortable feeling in the legs, including the toes. Upon examination, the VA provider found good strength and reflexes in the lower extremities.

A January 2016 VA treatment record reflects the Veteran complained of numbing pain in the entire right leg and to a lesser extent the entire left leg; the Veteran reported that could not feel the right leg when standing or walking at times but reported strong muscle strength. Upon examination, the Veteran walked normally and exhibited good strength in the legs and feet.

The Veteran underwent a VA examination for back conditions in August 2016, the examination report for which reflects positive findings for right and left lower extremity radiculopathy associated with the service-connected lumbar spine disability. The August 2016 VA examiner noted the right and left lower extremity radiculopathies had manifested in symptoms of mild intermittent pain, paresthesias, dysesthesias, and numbness involving the sciatic nerve. Strength, reflex, and sensory examinations in the right and left lower extremities were all normal. The VA examiner found no other signs or symptoms of radiculopathy. 

Based on the foregoing, the Board finds that the weight of the lay and medical evidence of record demonstrates that the right and left lower extremity radiculopathies had not more nearly approximated the criteria for a 20 percent rating under Diagnostic Code 8520 for symptoms of moderate incomplete paralysis of the sciatic nerve for any part of the initial rating period from June 6, 2016; therefore, higher initial disability ratings in excess of 10 percent are not warranted under Diagnostic Code 8520 for the right or left lower extremity radiculopathies. 38 C.F.R. §§ 4.3, 4.7. 

15. Rating the Bipolar Disorder

For the entire rating period on appeal from February 13, 2017, a 30 percent rating for the service-connected bipolar disorder under Diagnostic Code 9432 was assigned. 38 C.F.R. § 4.130. The appellant contends that an increased disability rating is warranted due to the evere symptoms such as a history of attempted suicide, psychiatric hospitalization, and severe social impairment. See June 2017 Notice of Disagreement. 

Pertinent to this case, the General Rating Formula for Mental Disorders provides that a 10 percent rating is assigned for occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medication. 38 C.F.R. § 4.130.

A 30 percent rating is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, recent events). Id.

A 50 percent rating is provided when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent rating is provided when there is evidence that the psychiatric disability more closely approximates occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); and inability to establish and maintain effective relationships. Id.

A 100 percent rating requires evidence of total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name. Id. 

The use of the term “such as” in the General Rating Formula for Mental Disorders in 38 C.F.R. § 4.130 demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of symptoms, or their effects, that would justify a particular rating. See Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). It is not required to find the presence of all, most, or even some, of the enumerated symptoms recited for particular ratings. Id. The use of the phrase “such symptoms as,” followed by a list of examples, provides guidance as to the severity of the symptoms contemplated for each rating, in addition to permitting consideration of other symptoms particular to each veteran and disorder, and the effect of those symptoms on his/her social and work situation. Id. 

In Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (2013), the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that VA “intended the General Rating Formula to provide a regulatory framework for placing veterans on a disability spectrum based upon their objectively observable symptoms.” The Federal Circuit stated that “a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration.” It was further noted that “§ 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused occupational and social impairment in most of the referenced areas.”

After a review of all the evidence, lay and medical, the Board finds that, for the entire rating period from February 13, 2017 to July 2018, the service-connected bipolar disorder had more nearly approximated occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, due to symptoms such as depressed mood and chronic sleep impairment. The bipolar disorder did not cause occupational and social impairment with reduced reliability and productivity.

The Veteran underwent a VA examination in August 2016, during which the VA examiner assessed the bipolar disorder was in remission at that time. The VA examiner noted that, while the Veteran’s mental condition had formally been diagnosed, his symptoms were not severe enough to either interfere with occupational and social functioning or to require continuous medication. During the August 2016 VA examination, the Veteran reported that he did not like people and spends time with his girlfriend, mother, father, and kids. The Veteran reported staying in bed most of the day and that he lost his appetite since starting treatment for hepatitis C several months ago. The Veteran endorsed difficulty falling asleep and staying asleep but the VA examiner noted the Veteran’s poor sleep hygiene. The VA examiner observed the Veteran was dressed neatly and well kempt, speech was logical and goal-oriented, he was oriented to person, place, situation and time, and had good concentration and attention. The Veteran exhibited good judgment and insight although his affect was slightly agitated and appeared irritable throughout the evaluation. The VA examiner noted that the results of the examination indicated the Veteran’s bipolar disorder was in remission as the Veteran did not report any recent clinically significant hypomanic or depressive symptoms, nor had he required any mental health treatment since the last examination.

An April 2017 VA examination report reflects the Veteran endorsed experiencing depressive symptoms again as well as insomnia, feelings of worthlessness, diminished concentration, lower energy/fatigue, and thoughts of death, but denied experiencing suicidal ideation. The Veteran reported he was living with his girlfriend and they did a lot together such as fish, garden, and yard work. The Veteran also reported working the gate every two weeks at stock car races and that he helped a friend manage cattle as a part time job. The Veteran reported shunning social activities when he could and becoming irritable and reclusive when his kids came to visit. The Veteran’s girlfriend also endorsed concern about the Veteran’s mood swings as he tended to become inexplicably angry for no discernable reason. The VA examiner noted symptoms of the bipolar disorder included depressed mood and chronic sleep impairment. The Veteran was observed to be alert and oriented, well groomed, able to maintain good eye contact, and cooperative, with normal speech, and logical thought processes; the Veteran reported being angry a lot of the time but mostly about his declining health and battle with cancer. The VA examiner noted no evidence of delusions or hallucinations or any significant memory concerns, and the Veteran denied suicidal and homicidal ideation. The VA examiner assessed the bipolar disorder resulted in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation.

Other VA treatment records generally reflect mild mental health symptoms and that the Veteran had been continuously observed to be alert and oriented, without significant psychiatric symptoms. A January 2016 VA treatment record shows the Veteran denied any mood changes, anxiety, loss of memory, or suicidal ideation. A March 2016 VA treatment record reflects the Veteran’s mannerisms and interactions were appropriate. A June 2016 VA treatment record shows the Veteran reported he was getting angrier and more frustrated at times, but denied thoughts of hurting himself or others and endorsed coping skills of walking away to calm down. Contrary to the appellant’s assertions in the June 2017 Notice of Disagreement, VA treatment records throughout the relevant rating period on appeal show the Veteran consistently denied suicidal ideation and do not show any psychiatric hospitalizations during that time. Additionally, the April 2017 VA examination report shows the Veteran did not suffer from severe social impairment as he was still able to enjoy leisure activities with his girlfriend and work at the stock car races and on his friend’s cattle ranch.

The Board has carefully reviewed the lay and medical evidence of record and finds that the preponderance of the evidence is against the assignment of an increased disability rating in excess of 30 percent for the service connected bipolar disorder for the entire rating period from June 6, 2016. The evidence of record shows the bipolar disorder more nearly approximated occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, due to symptoms such as depressed mood and chronic sleep impairment. 

The evidence shows that the severity, frequency, and duration of the bipolar symptoms did not cause occupational and social impairment with reduced reliability and productivity. The VA examination reports and VA treatment records, including the Veteran’s lay reports of symptoms and functional impairments recorded therein, demonstrate the Veteran had been consistently observed to be alert, oriented and in touch with reality, without impairment of judgment, ability to communicate, or ability to understand and follow simple directions. The credible evidence does not demonstrate symptoms such as panic attacks that occur more than once a week, impaired judgment, impaired abstract thinking, or difficulty establishing and maintaining effective work and social relationships, at any time during the rating period on appeal.

The Board has considered all the symptoms discussed above, including their severity, frequency, and duration. In evaluating these symptoms, the Board finds that the severity, frequency, and duration of the bipolar disorder were more consistent with the symptoms and degrees of social and occupational impairment contemplated by the 30 percent disability rating, and did not more nearly approximate the symptoms and degrees of social and occupational impairment contemplated for a 50 percent disability rating. See 38 C.F.R. § 4.130, Diagnostic Code 9432. For these reasons, the Board finds that the preponderance of the evidence is against the appeal for an increased disability rating for bipolar disorder in excess of 30 percent for the period from February 13, 2017 forward. 38 U.S.C. § 1155; 38 C.F.R. §§ 4.3, 4.7, 4.130, Diagnostic Code 9432.

16. TDIU

A TDIU may be assigned when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. The service-connected disabilities, employment history, educational and vocational attainment, and all other factors having a bearing on the issue will be addressed in both instances. 38 C.F.R. § 4.16(a), (b).

If there is only one such disability, it must be rated at 60 percent or more; if there are two or more disabilities, at least one disability must be rated at 40 percent or more, with sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a). In evaluating a veteran’s employability, consideration may be given to the level of education, special training, and previous work experience in arriving at a conclusion, but not to age or impairment caused by non-service-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19.

Individual unemployability must be determined without regard to any non service connected disabilities or a veteran’s advancing age. 38 C.F.R. §§ 3.341(a), 4.19; Van Hoose v. Brown, 4 Vet. App. 361 (1993). The sole fact that a veteran is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is recognition that the impairment makes it difficult to obtain or keep employment, but the ultimate question is whether a veteran is capable of performing the physical and mental acts required by employment, not whether a veteran can find employment. Id. at 361. When reasonable doubt arises as to the degree of disability, such doubt will be resolved in a veteran’s favor. 38 C.F.R. § 4.3.

The appellant generally asserts that prior to death the Veteran was unable to obtain or maintain substantially gainful employment due to service-connected disabilities. See September 2014 claim. As a total (100 percent) rating was in effect for the period from August 10, 2016 to November 1, 2016, the Board will only address the issue of a TDIU for the period from September 22, 2014 to August 10, 2016, and from November 1, 2016 to July 2018.

After a review of all the evidence, lay and medical, the Board finds that the Veteran was not rendered unable to obtain or maintain substantially gainful employment due to service-connected disabilities. As of September 22, 2014 (the date of the TDIU claim), the service-connected disabilities were onychomycosis (60 percent disabling) and bipolar disorder (30 percent disabling). As of June 6, 2016, service-connected disabilities also included lumbar spine disability (10 percent disabling), right lower extremity radiculopathy (10 percent disabling), left lower extremity radiculopathy (10 percent disabling), tinnitus (10 percent disabling), and left ear hearing loss (0 percent disabling). As such, the service-connected disabilities meet the combined rating percentage criteria for consideration of a TDIU under 38 C.F.R. § 4.16(a).

The record reflects that prior to death the Veteran had worked in road construction in the 1990s, had not worked since November 1996, and had a high school education. See August 2015 Application for Increased Compensation Based on Unemployability. 

A May 2015 VA treatment record reflects the Veteran reported onychomycosis in the fingernails caused severe dry and cracked skin in the hands and that he was unable to work due to severe pain in the hands. A June 2015 VA treatment record shows the Veteran reported his hands had been better than they had ever been but that onychomycosis in the toenails remained unchanged as he had not been receiving treatment for the feet. The Veteran reported wearing gloves constantly day and night as all of his fingernails had been previously removed. Upon examination, the VA provider noted the Veteran’s hands looked very normal after removal of the gloves, and noted poorly defined pink plaques that form thick lichenified fissures on the soles of the feet. Surgical resection of all nails were noted with sporadic grown of small portions of nail giving the appearance of onychoheterotopia. The VA provider noted that chronic hand dermatitis had greatly improved with the foot dermatitis not treated. The November 2015 VA examination report discussed above contains the VA examiner’s assessment that the onychomycosis in the fingernails and toenails, the linear scars of the hands and feet, and scars of the hands and feet did not result in any functional impact on the Veteran’s ability to work.

Similarly, the November 2016 VA examination for back disorders reveals that, while the service-connected lumbar spine disability and right and left lower extremity radiculopathy manifested in pain and painful motion, the VA examiner assessed that neither the lumbar spine disability or the right and left lower extremity radiculopathies resulted in any functional impact on the Veteran’s ability to work. 

An August 2016 VA audiometric examination reflects the left ear hearing loss caused difficulty hearing others when the Veteran was not being spoken to directly. The Veteran also reported tinnitus in both ears that had been constant when he first separated from service, but that it had faded since then and was only intermittent at the time of the examination. The VA examiner assessed the tinnitus did not result in any functional impact on the Veteran’s ability to work.

As discussed above, the August 2016 VA examination report for mental health disorders reflects the VA examiner assessed the bipolar disorder was in remission at the time. Although the April 2017 VA examination report for mental health disorders includes the VA examiner’s assessment that the Veteran’s bipolar disorder had resulted in moderate social impairment, the bipolar disorder had only resulted in a mild level of occupational impairment. Importantly, during the April 2017 VA examination, the Veteran reported working the gates every two weeks at stock car races and working part time helping a friend manage cattle, which is strong evidence that the service-connected disabilities did not prevent the Veteran from employment involving at least light, if not moderate, physical activity.

(Continued on the next page)

 

Based on the foregoing, the Board finds that the weight of the lay and medical evidence demonstrates that the service connected disabilities did not prevent obtaining or maintaining substantially gainful employment for any period from September 22, 2014 to August 10, 2016, and from November 1, 2016 to July 2018. As the preponderance of the lay and medical evidence is against a finding for a TDIU, the claim must be denied. See 38 U.S.C. § 5107; 38 C.F.R. § 3.102.

 

J. PARKER

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD E. Choi, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.